## James McNamara v. W. H. Godair et al.

1. EXECUTION SALE—*What Interests Not Subject to.*—By taking domestic animals to care for and feed until ready for market, for a compensation, the feed being furnished by the owner, a person does not acquire such a right of ownership in the property as is subject to levy and sale upon execution against him.

2. AGISTER'S LIEN—*Not Subject to Execution Sale.*—An agister's lien is a personal privilege, which the person entitled to may avail him of or waive as he pleases. It is a personal lien not liable to voluntary transfer and can not be subject to a writ of execution.

**Replevin.**—Appeal from the Circuit Court of Stephenson County; the Hon. James Shaw, Judge, presiding. Heard at the December term, 1894. Affirmed. Opinion filed May 28, 1895.

M. B. Loomis and J. H. Stearns, attorneys for appellant.

J. A. Crain, attorney for appellees.

Mr. Justice Harker delivered the opinion of the Court.

This was an action of replevin by appellees, live stock and commission merchants, doing business in Chicago under the firm name of Godair, Harding & Co., to recover possession of 5,100 head of sheep, which had been levied upon by appellant as sheriff by virtue of executions against one John C. Atkinson.

To the declaration eleven pleas were interposed, consisting of *non cepit*, *non detinet*, property in the defendant, property in one Hiram Waltz, property in John C. Atkinson, pleas that the property was taken by virtue of execution against Atkinson as the property of Atkinson, etc.; that plaintiffs delivered the sheep to defendant to be agisted; that defendant held them by virtue of his agister's lien, and that Atkinson held an agister's lien upon the sheep, wherefore he, as sheriff, levied upon the sheep by virtue of certain executions against Atkinson as the property of Atkinson.

The court sustained a demurrer to the last mentioned plea. Upon the other pleas issues were formed which, upon trial by jury, were found for the plaintiffs. As grounds for reversing the judgment entered upon the finding, appellant urges that the court admitted improper evidence on behalf of the plaintiffs; that the verdict is against the evidence; that improper instructions were given for the plaintiffs, and that proper instructions for the defendant were refused.

The chief facts leading to the litigation are as follows: Prior to September, 1892, appellees and John C. Atkinson had operated together in a number of large sheep deals. It had been the habit of appellees to advance to Atkinson sums of money to purchase sheep and get them ready for

market. To secure them, unrecorded bills of sale from Atkinson for the different lots of sheep were held by them.

In that month a new deal was agreed upon whereby a large lot of sheep should be purchased in Colorado by appellees and shipped from there to Chicago. Under a privilege granted by the railroad company the sheep were to be taken from the cars at South Freeport, and there fed for market in Atkinson's yards. When ready for market they were to be reloaded and sent on to appellees at Chicago. It was distinctly understood that the sheep so purchased should be the property of appellees.

Accordingly appellees' sheep buyers, George W. McCarthy and Atkinson, went to Colorado, and there bought 10,000 heads for appellees, and Atkinson bought 4,259 on his own account. The entire lot was shipped in two train loads late in October, and were placed in Atkinson's yards at South Freeport November 1st. A few days later one of appellees went to Freeport and looked over the sheep. There were then in the yards of Atkinson in the neighborhood of 16,000 head. Some of these Atkinson had bought on his own account on the Colorado trip, and some were sheep held on old deals with appellees. To prevent any misunderstanding as to the 10,000 head bought by appellees in Colorado, and to keep them distinct from those held over on old deals, the following writing was drawn up and signed:

" Whereas, there are now in barn No. 1, and in pens on the north side of barn No. 2 at South Freeport, Ill., 10,000 sheep, bought of Seldomridge & Pebbles, at Kit Carson, Colorado, for Godair, Harding & Co., of Chicago, Ill., paid for by them, and shipped to them at Chicago, Ill., and stopped in transit to feed at South Freeport, now, it is hereby agreed between said Godair, Harding & Co. and John C. Atkinson, of Freeport, Ill., that said Godair, Harding & Co. employ said Atkinson to care for and feed said sheep for them until ready for market, and to furnish feed for same themselves, and to pay said Atkinson for his services all said sheep shall bring in market over first cost of shipment, feed, and their commissions for selling

same, including interest on money paid by them and invested in said venture; and said Atkinson agrees to care for and feed said sheep, and when ready for market to reship the same to said Godair, Harding & Co., at Chicago, Ill., and to accept for his services the consideration so as above agreed to be paid him.

Witness the hands of said parties hereto this 1st day of November, A. D. 1892.

Godair, Harding & Co.,<br>John C. Atkinson.

Witness: H. C. Hyde."

This agreement covered the original terms of the agreement under which the sheep were purchased.

By December 6th appellees had advanced to Atkinson for feed about $7,000. Claiming that the feed was out he called on them for $5,000 more, which was paid. On January 17th he called on them for $1,500 more, which they paid. The amount already paid far exceeded that which Atkinson had estimated would be necessary to get the sheep ready for market. On February 11th he wired for $2,500 more feed money. Up to this date only 406 of the sheep had been marketed. In response to the last call W. H. Godair went to Freeport, and shipments followed every day until February 21st, amounting in all to 4,475 head. A controversy then arose over additional feed money demanded by Atkinson. Others of the firm came upon the ground preparatory to shipping out the remainder of the sheep. They remained upon the ground looking after them until on the 26th of February, when they were ejected by an agent of Atkinson and a sheriff at the instance of Atkinson. Atkinson then confessed judgments in favor of one Allen for $5,216, and in favor of one Waltz for $20,200. Execution immediately issued and were levied upon the 5,100 sheep in controversy, being the remainder of the 10,000 purchased in Colorado as the property of Atkinson. The sheep were advertised for sale for the 10th of March, when they were replevied by appellees.

It is plain from the foregoing statement of facts that the

sheep in controversy were not the property of Atkinson, but the property of appellees. Atkinson was not a partner with appellees in this deal and had no right of ownership in the property that was subject to execution, levy and sale. Under his agreement he had no claim of property excepting in the proceeds after sale. His interest in the proceeds could not attach until after he had complied with his part of the agreement and the sheep were marketed. Nor were appellees guilty of any act or misrepresentation which estopped them from asserting their right to the property as against execution creditors of Atkinson.

It is insisted, however, that the contract had been abandoned. We think not. It is true appellees refused to advance the further sum of $2,500 demanded for feed on the 17th of February. The extravagant draws which had been made on them for feed before that date far exceeded what Atkinson said would be ample to feed the sheep, and there appeared good ground for a suspicion that all demanded was not necessary to the feeding of their sheep. Appellees simply went upon the ground to investigate and get the sheep off to market as rapidly as possible. While in the pursuit of that purpose they were ejected from the grounds by order of Atkinson. The only evidence of an intent or desire to abandon is furnished in the conduct of Atkinson in driving appellees off the premises, putting the sheep in the possession of his agents and the deputy sheriffs, confessing judgments for large amounts, and in having executions issue forthwith and levied upon the sheep as his property.

It is also contended that if it be held that appellees were the owners of the property, then Atkinson had an agister's lien which was such an interest as could be levied upon and sold. . Under the contract and circumstances in evidence it is extremely doubtful whether Atkinson had an agister's lien. He does not seem to have asserted it at any time. Neither his execution creditors nor appellant, when he levied upon the property, claimed that they were seeking to reach Atkinson's interest as an agister. Appellant levied upon the property as the property of Atkinson, exclusively, and advertised to sell and convey the whole title. He testified

that he should have so sold it but for the interference of appellees.

But if it be conceded that Atkinson had an agister's lien it was not, in our opinion, subject to execution, levy and sale. It is a personal lien not liable to voluntary transfer and can not be subject to a writ of execution. Freeman on Executions, Secs. 110 and 112. It is a personal privilege which the person who is entitled to it may avail himself of if he pleases; it can not be set up by an attaching officer or other person in defense of an action by the owner. Breadly v. Stafford, 23 N. H. 444; Lovill v. Brown, 40 N. H. 511; Holly v. Hungerford, 8 Pick. 50.

As against appellant and the rights of Atkinson's execution creditors appellees were clearly entitled to the possession of the property and the verdict of the jury was right.

There is an elaborate discussion of the instructions. Some of them are justly subject to criticism, but it is so manifest to us that substantial justice has been done that we deem it unnecessary to consider them in this opinion. Judgment affirmed.